# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 14-CV-7508 (JFB)

JAMES CRAIG LATNEY,

Plaintiff,

VERSUS

CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**MEMORANDUM AND ORDER**
February 18, 2016

JOSEPH F. BIANCO, District Judge:

Plaintiff James Craig Latney ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, the Commissioner of Social Security ("defendant" or "Commissioner"), denying plaintiff's application for disability insurance benefits ("DIB"). An Administrative Law Judge ("ALJ") found that plaintiff had the residual capacity to perform the full range of sedentary work as defined by 20 C.F.R. § 404.1567(a), and that although he was unable to perform any past relevant work, there were a number of jobs in the national economy that he could perform. Therefore, the ALJ determined that plaintiff was not disabled, and thus, was not entitled to benefits. The Appeals Council denied plaintiff's request for review.

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Plaintiff has opposed the Commissioner's motion and filed a cross motion for judgment on the pleadings, or in the alternative, remand, arguing that the ALJ erred by: (1) failing to properly weigh the medical evidence; and (2) failing to properly evaluate plaintiff's credibility.

For the reasons set forth herein, the Court denies the Commissioner's motion for judgment on the pleadings, denies plaintiff's cross-motion for judgment on the pleadings, and grants plaintiff's motion to remand. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ clearly failed to properly weigh the opinion of the treating physician, Dr. Lieberman. Although the ALJ cited other medical evidence in support of his position, the ALJ did not apply all of the required factors or specifically explain how the other evidence undermined the treating physician's opinion regarding plaintiff's

inability to work. Accordingly, remand is warranted.

## I. BACKGROUND

### A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

#### 1. Personal and Work History

Plaintiff was born on May 20, 1966, and was forty-six years old at the time of the ALJ's decision. (AR at 163.) Plaintiff has two years of college education. (AR at 139.)

Prior to January 2009, plaintiff worked as a truck driver for two years, which was described by the ALJ as "generally heavy in exertion, required lifting/carrying up to one hundred pounds." (AR at 27, 139.) He previously worked as a tent builder and a roofer/painter. (AR at 139.) Plaintiff has not worked since April 24, 2012, the application date. (AR at 23, 36.)

On June 7, 2012, plaintiff completed a "Function Report," which detailed his daily activities, as well as how his condition affected his ability to perform various tasks. (AR at 163-74.) Plaintiff indicated that he was limited in walking because his "knees and back just can't take the pain after a while," that sitting "gets uncomfortable after [a] few minutes," that he is limited in climbing the stairs because his "knees don't bend far and a lot of pain when [he] push[es] off 1 leg," that his knees were "too bad" to kneel, and that he had "limited motion" to squat. (AR at 166.) Plaintiff stated that he could walk one or two blocks before having to stop and rest, and that he would have to rest five to seven minutes before he could continue walking. (AR at 167.) He stated that he had problems paying attention because he was "in a lot of pain," but that he could follow written and spoken instructions and usually finish what he started "not at once but over time." (*Id.*) Plaintiff indicated that he did not have trouble remembering things. (AR at 168.) Plaintiff reported that stress or changes in schedule heightened his "already existing aches and pain." (*Id.*)

Plaintiff reported that he thought that he first had the pain in 1995 and that the pain first began to affect his activities after his second knee operation. (*Id.*) He indicated that he was receiving medical treatment from Dr. Lieberman and had an MRI done to evaluate his pain. (*Id.*) Plaintiff indicated that his pain consisted of "sharp pains in knees and back" and "aches and spasms, stabbing." (*Id.*) He reported that he needed special help or reminders to take care of his personal needs and grooming, as well as to take medication, but did not elaborate on what kind of help he needed. (AR at 169.) Plaintiff indicated that it was hard for him to get off the toilet once he sat down on the seat. (*Id.*) Plaintiff reported that he could prepare canned or microwavable food, though he stated that he did not prepare food when asked how often he prepared foods or meals. (*Id.*) He stated that he would stop at friends' or family members' homes to eat. (*Id.*) Plaintiff stated that he could take out small loads of garbage, but that he needed help doing laundry and could not do house or yard work because he was not able to stand longer than seven to ten minutes. (AR at 170.) Plaintiff reported that he would go outside "as often as possible," but that he would not go out due to his back and knee pain and because his medication made him drowsy. (*Id.*) Plaintiff stated that he could go out alone but preferred not to do so. (*Id.*) He indicated that he had a driver's license but did not drive because he took "too many medications." (AR at 171.)

2

Plaintiff reported that he did not shop, and stated that he could not pay bills though he could count change and handle a savings account, and that his ability to handle money had not changed since his injury began. (*Id.*) Plaintiff indicated that his hobbies included reading and playing games, and that he did these activities "as often as possible." (*Id.*) Plaintiff reported that he was no longer able to play sports or drive, and that he was always drowsy. (AR at 172.) Plaintiff noted that he would talk on the phone three times a week and would go to friends' homes on a regular basis. (*Id.*) He reported that his social activities were impacted by his injuries because he could not stand or sit for too long. (*Id.*)

Plaintiff reported that he would get sharp pains in his back, legs, and knees when he lifted items, and would get back spasms and "excruciating pain" when he stood. (*Id.*) He further reported that sitting, standing, and walking brought on his pain. (AR at 173.) He indicated that he felt the pain in his knees and "all over [his] back but mostly lower back." (*Id.*) He reported that his pain had gotten worse over the years and that he felt the pain "all day every day and night." (*Id.*) Plaintiff stated that he took Soma, Percocet, and Meloxicam for his pain, but that the medication "doesn't really stop the pain" and just made him tired. (*Id.*)

2. Medical History

Beginning in January 27, 2010, plaintiff was treated by Dr. Paul Cooperman (AR at 259.) On March 1, 2011, Dr. Cooperman noted plaintiff's history of knee surgeries, including ACL and MCL repairs, and that he had multiple broken bones over the years. (AR at 262.) Dr. Cooperman noted that plaintiff complained of arthritic pain and disc problems in his lower back that he said he felt every day. (*Id.*) Dr. Cooperman further indicated that plaintiff sometimes felt shooting pain behind his right thigh and that plaintiff's pain was "severe." (*Id.*) An X-ray of plaintiff's lumbar spine showed moderate degenerative disc disease at the L5-S1. (*Id.*) No joint swelling was noted, and plaintiff's strength and sensation were intact in his lower extremities. (*Id.*) Dr. Cooperman noted mild tenderness to palpitation of the lumbar spine with full range of motion and that straight leg rising was negative bilaterally. (*Id.*) Dr. Cooperman's impression was low back pain and arthralgia, and he prescribed Voltaren, Vicodin, and Flexeril, and referred plaintiff to orthopedic and cardiology specialists. (*Id.*) At a follow-up appointment on March 16, 2011, plaintiff reported that he still had pain, but it was improving with medication. (AR at 264.) However, plaintiff reported that the medication did not last the full twelve hours so he had been doubling up on medication. (*Id.*) Dr. Cooperman noted that plaintiff's arthritis panel was within normal limits, and that plaintiff had seen a cardiologist but had not yet made an orthopedist appointment. (*Id.*)

On January 11, 2012, plaintiff visited Dr. Gregory Lieberman of Orlin & Cohen Orthopedics Associates, complaining of lower back pain, mid aspect with spasm.[1] (AR at 244-45.) Plaintiff reported that his pain was located at his spine/back, neck, right knee, and left knee, and described the pain as dull/aching and stabbing. (*Id.*) Plaintiff reported that his pain was at a 9 out of 10 when at rest, 9 to 10 out of 10 in severity, and that it had been present for twelve years. (*Id.*) Plaintiff indicated that the medications Soma and Mobic helped his pain. (*Id.*) A physical examination of plaintiff revealed muscle spasm and diminished rotation in his back, including spine. (AR at 245.) Plaintiff had a

---

[1] The January 11, 2012 form indicates that plaintiff was there for a follow-up visit and alludes to a prior visit. (AR at 244.) However, the record is devoid of any other evidence of a prior visit to Dr. Lieberman.

forward flexion of 60 degrees, no radicular symptoms, and was intact in the bilateral lower extremities. (*Id.*) Dr. Lieberman diagnosed plaintiff with a bulging disc, muscle spasm, and lumbago syndrome, and directed plaintiff to ice the affected areas and follow a home exercise program. (*Id.*) Dr. Lieberman prescribed plaintiff with Meloxicam and Soma. (*Id.*)

Plaintiff returned to Dr. Lieberman on February 15, 2012. (AR at 246-47.) Dr. Lieberman noted that plaintiff was known to have lower back and knee issues, was holding off on injections, and was requesting renewal of his prescriptions. (AR at 246.) Plaintiff again indicated that his pain was located at his spine/back and right and left knees. (*Id.*) Plaintiff described the pain as dull/aching and sharp, and assessed it as a 9 out of 10 when he was resting, 10 out of 10 when active, and 10 out of 10 in severity. (*Id.*) Plaintiff's physical examination revealed similar results as the prior examination, and Dr. Lieberman's assessment of plaintiff's condition remained the same. (AR at 247.) Plaintiff was again directed to ice the affected areas and follow a home exercise program; no new medications were prescribed. (*Id.*)

On May 9, 2012, plaintiff returned to Dr. Lieberman for a follow-up appointment, complaining of "lower back disc bulges and knee stiffness after sitting and immobile." (AR at 228-29.) Dr. Lieberman indicated that home exercise and medications helped, but plaintiff still described his pain as a 9 out of 10 when he was resting, 10 out of 10 when active, and 9 out of 10 in severity, and dull/aching and shooting in nature. (AR at 228.) The range of motion in plaintiff's knees was 130 degrees when in flexion, and testing of both knees revealed patella grind positive and positive crepitus with range of motion. (AR at 229.) Dr. Lieberman also noted that palpitation of both knees revealed tender patella, and that plaintiff's lumbar examination revealed muscle spasm, diminished rotation, a forward flexion of 60 degrees, and no radicular symptoms. (*Id.*) Dr. Lieberman diagnosed plaintiff with a bulging disc, muscle spasm, lumbago syndrome, osteoarthritis of knee, and internal derangement of knee joint. (*Id.*) Dr. Lieberman noted that plaintiff should try glucosamine and chondroitin, and that plaintiff did not want lumber epidural steroid injections. (*Id.*) Dr. Lieberman again directed plaintiff to ice the affected areas and follow the home exercise program, and prescribed Soma, Meloxicam, and Percocet. (*Id.*)

On June 11, 2012, plaintiff saw Dr. Joyce Graber for a consultative exam at the request of the Social Security Administration. (AR at 238-41.) Dr. Graber noted plaintiff's complaints of joint pain and stiffness in both knees that had existed for many years, and that plaintiff assessed his right knee pain as a 10 out of 10 and left knee pain as an 8.5 out of 10. (AR at 238.) Dr. Graber noted that plaintiff reported that he could walk about one and a half blocks before having to stop, and that he had surgery on his left knee in 1982 and on his right knee in 1996. (*Id.*) Dr. Graber further indicated that plaintiff reported constant back pain assessed at a 10 out of 10, from which he had suffered for 12 years. (*Id.*) Dr. Graber indicated that plaintiff was taking Meloxicam daily, Soma three times a day, and Percocet every four hours. (*Id.*) Dr. Graber noted that plaintiff lived with his family and friends, showered and dressed himself on a daily basis, watched television, listened to the radio, read, went out to get fresh air, and socialized with friends. (AR at 238-39.) Dr. Graber indicated that plaintiff did not cook, clean, do laundry, or shop. (AR at 238.)

Dr. Graber's medical examination of plaintiff revealed that he appeared to be in no acute distress, and that his gait and stance were normal. (AR at 239.) Dr. Graber

4

reported that plaintiff could not walk on his heels and toes, and declined to squat because it would be too painful and he would have difficulty standing up. (*Id.*) Dr. Graber noted that plaintiff did not use an assistive device, did not require help changing or getting on and off the exam table, and was able to rise from a chair without difficulty. (*Id.*) Dr. Graber reported that plaintiff's cervical spine showed full flexion, extension, lateral flexion, and full rotary movements bilaterally. (AR at 240.) Dr. Graber did not find scoliosis or kyphosis or abnormality in plaintiff's thoracic spine. (*Id.*) Dr. Graber found that plaintiff's lumber spine showed limited flexion extension to about 20 degrees, and that lateral flexion and rotation were intact bilaterally. (*Id.*) Dr. Graber reported that plaintiff had full range of motion of the shoulders, elbows, forearms, and wrists bilaterally, but limited range of motion of his hips to 90 degrees flexion extension bilaterally. (*Id.*) Plaintiff's interior and exterior rotation on the right was found to be limited to 20 degrees and on the left to 30 degrees, backward extension was limited to 50 degrees bilaterally, abduction to 20 degrees bilaterally, and adduction to 10 degrees bilaterally. (*Id.*) Plaintiff reported pain in his back during those movements. (*Id.*) Dr. Graber noted that plaintiff's flexion extension of his knees was limited to 90 degrees on the right and 100 degrees on the left. (*Id.*) Dr. Graber also noted that an X-ray revealed degenerative changes of the lumbar spine and surgery on plaintiff's right knee. (AR at 241; *see also* AR at 242-43.) Plaintiff's examination was otherwise normal. (AR at 238-41.)

Dr. Graber diagnosed plaintiff with back pain by history and bilateral knee pain by history. (AR at 240-41.) Dr. Graber's opinion was that plaintiff had a "mild limitation for squatting, bending, climbing and other such activities." (AR at 241.)

On June 20, 2012, plaintiff returned to Dr. Lieberman, complaining again of lower back and knee pain, and also indicated that he was trying to walk to lose weight, which was causing lower back pain. (AR at 297-98.) Plaintiff described his pain as a 9 out of 10 when he was resting, 10 out of 10 when active, and 9 out of 10 in severity, and dull/aching and sharp and shooting in nature. (AR at 297.) Physical examination of plaintiff's knees revealed tender patella upon palpitation, and positive patella grind and positive crepitus with range of motion. (AR at 298.) Plaintiff's range of motion in both knees was noted as 130 degrees, and his lumbar examination revealed muscle spasms, diminished rotation, and a range of motion of forward flexion 60 degrees. (*Id.*) Dr. Lieberman diagnosed plaintiff with a bulging disc, muscle spasm, lumbago syndrome, osteoarthritis of knee, and internal derangement of knee joint, and indicated that plaintiff had tried glucosamine and chondroitin without sucess. (*Id.*) Dr. Lieberman again directed plaintiff to ice the affected areas and follow a home exercise program. (*Id.*) Dr. Lieberman noted that plaintiff did not want LESI or HA injections, and would need a letter of medical necessity for orthovisc injections in both knees. (*Id.*)

Plaintiff again returned to Dr. Lieberman on July 18, 2012, August 15, 2012, and September 27, 2012. (AR at 299-304.) Plaintiff's description of his pain levels and Dr. Lieberman's assessment of plaintiff were largely similar to plaintiff's June 20, 2012 visit. (*Id.*) However, Dr. Lieberman noted on July 18, 2012, that plaintiff told him that the copay for orthovisc was too high so Dr. Lieberman suggested that plaintiff try Synvisc, Suprutz, or Euflexxa to see if they were less expensive. (AR at 299-300.) On August 15, 2012, Dr. Lieberman directed plaintiff to "do Synvisc one in future and to see pain management." (AR at 302.) On September 27, 2012, Dr. Lieberman noted

5

that plaintiff felt better and did not want injections, but was considering pain management and would possibly do Synvisc one in the future. (AR at 303-04.) On October 17, 2012, plaintiff had another very similar follow-up appointment with Dr. Lieberman, except that plaintiff described the severity of his pain at 10 out of 10, and 9 out of 10 at rest. (AR at 305-06.) Plaintiff indicated again that he felt better and did not want injections, and was requesting renewal of his prescriptions. (AR at 305.)

On December 26, 2012, plaintiff visited Dr. Lieberman and reported that he used his friend's rocicontin, which helped him. (AR at 307-09.) Dr. Lieberman noted that plaintiff complained of a "new flare without any injury" and described his back pain as radiating down his legs. (AR at 307.) In addition to plaintiff's prior conditions previously noted, Dr. Lieberman wrote that radicular symptoms were "present for + radicular with extension/lateral bending" and that X-rays of plaintiff's knees showed degenerative changes. (AR at 308.) Dr. Lieberman again recommended icing and home exercise, and prescribed Percocet. (AR at 309.) The reports of plaintiff's March 6 and March 13, 2013 visits were again very similar to the previous reports. (AR 310-15.) However, in a note dated April 24, 2013, and appearing on the March 13, 2013 visit record, Dr. Lieberman noted that plaintiff was "still totally disabled." (AR at 315.)

On March 18, 2013, Dr. Lieberman completed a Disability Questionnaire. (AR at 287-94.) Dr. Lieberman indicated that he had seen plaintiff since January 24, 2011, had most recently seen plaintiff on March 13, 2013, and saw plaintiff "every 6 weeks or so." (AR at 287.) Dr. Lieberman indicated that the earliest date to which the described symptoms and functional limitations applied was more than twelve months prior to the assessment. (AR at 293.) He diagnosed plaintiff with osteoarthritis of both knees, and lumbar disc bulges and osteoarthritis. (AR at 287.) Dr. Lieberman opined that plaintiff's prognosis was "poor." (*Id*.) Dr. Lieberman indicated that clinical findings supporting his diagnosis included restricted range of motion in plaintiff's knees and lower back, crepitus, and grinding with motion. (*Id*.) Dr. Lieberman also cited an MRI of plaintiff's lumbosacral spine and bulging disks, and X-rays of plaintiff's knees that showed osteoarthritis. (AR at 288.) Dr. Lieberman noted that plaintiff's primary symptoms were pain, swelling, and decreased motion, and that his symptoms and functional limitations were reasonably consistent with his physical impairments. (*Id*.) Dr. Lieberman described plaintiff's pain as dull, aching, sharp, and stabbing, located in both knees and the lower back, present every day intermittently, and precipitated by any activity. (*Id*.) Dr. Lieberman estimated both plaintiff's pain and fatigue as a 9 out of 10 (severe), and reported that he was not able to completely remove plaintiff's pain or symptoms with medication without unacceptable side effects. (AR at 289.) Dr. Lieberman reported that plaintiff was taking Percocet, Soma, and Mabic, and that these medications had the side effects of drowsiness, impaired judgment, and stomach issues. (AR at 291.) Dr. Lieberman indicated that he had not substituted medications to try to reduce symptoms or relieve side effects, but that plaintiff had tried physical therapy. (*Id*.)

Dr. Lieberman opined that plaintiff could sit for one hour in an eight-hour work day and stand/walk for one hour. (AR at 289.) Dr. Lieberman further estimated that plaintiff could occasionally (described as "up to 1/3 of an 8 hour work day") lift or carry 10-20 pounds, and could frequently (described as "up to 2/3 of an 8 hour work day") lift or carry up to 10 pounds. (*Id*.) Dr. Lieberman indicated that plaintiff did not have significant limitations in doing repetitive

6

reaching, handling, fingering, or lifting. (AR at 290.) Dr. Lieberman opined that plaintiff would need to alternate positions between sitting and standing/walking every 15 minutes in order to relieve pain or other symptoms. (*Id*.) Dr. Lieberman noted that plaintiff would have no limitation in grasping, turning, twisting objects, using fingers and hands for fine manipulations, or using arms for reaching (including overhead). (*Id*.) Dr. Lieberman indicated that plaintiff would be limited in working at a regular job on a sustained basis due to his inability to push, pull, bend, or stoop. (AR at 293.)

Dr. Lieberman opined that plaintiff's condition interfered with his ability to keep his head and neck in a constant position, such as looking at a computer screen or down at a desk, and thus, plaintiff could not sustain full-time employment at a job that required that specific ability on a sustained basis. (AR at 291.) Dr. Lieberman reported that plaintiff's experience of pain, fatigue, or other symptoms was frequently severe enough to interfere with his attention and concentration. (*Id*.) Dr. Lieberman opined that plaintiff's impairments lasted or could be expected to last at least twelve months, that plaintiff was not a malingerer, and that psychological or emotional factors did not contribute to the severity of plaintiff's symptoms and limitations. (AR at 292.) Dr. Lieberman indicated that plaintiff was capable of handling low work stress, that his impairments were likely to produce good and bad days, and that he would likely be absent from work more than three times per month due to his condition. (*Id*.)

### 3. Additional Medical Evidence Submitted to Appeals Council

As part of his appeal, plaintiff submitted additional records from his treatment with Dr. Lieberman from June 20, 2012 through August 2013.[2] (AR at 334-82.) In the records of plaintiff's treatment following March 2013, plaintiff continued to complain of similar back and knee pain, and Dr. Lieberman's assessment of plaintiff's condition was consistent with earlier findings. (AR at 334-36, 376-78.) Dr. Lieberman also opined that due to his knee and back pain, plaintiff was unable to perform any type of work for up to one year. (AR at 336; *see also* AR at 378).

### 4. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified before the ALJ on March 19, 2013. (AR at 35-50.) Plaintiff testified that he had not worked since he filed his Social Security claim in April 2012 because he had a lot of pain in his knees and lower back, and because his pain medication made him drowsy so he could not continue his work as a truck driver. (AR at 36.) Plaintiff reported that other side effects from his medication included difficulty remembering things, pain in his side near his kidneys, and mood swings. (*Id*.) Plaintiff testified that he could only walk about a block and a half to two blocks before he had to sit down due to his back and knee pain, and that he could only stand about four to five minutes, and sit for ten to fifteen minutes before having to readjust himself. (AR at 37.) He testified that his most comfortable position was laying on his side with a pillow between his legs and that he would lie like

---

[2] Many of these records detailed his 2012 treatment by Dr. Lieberman and, thus, were duplicates of documents previously submitted to the ALJ. The additional evidence consisted of records of plaintiff's June 3, 2013 visit, which was submitted twice, (*see* AR at 334-36, 373-75), plaintiff's August 28, 2013 visit, (AR at 376-78), and plaintiff's patient intake forms for his appointments with Dr. Lieberman, (AR at 355-70).

that three to four times a day for twenty-five to thirty minutes each time. (AR at 37-38.)

Plaintiff testified that he did not have his own home but that he did not consider himself homeless because he would stay with family and friends. (AR at 38.) He reported that he was married but had been separated since 2009. (*Id.*) Plaintiff testified that he had some difficulties with self-care, such as bathing and getting up from the toilet. (AR at 39-40.) However, plaintiff testified that he could shower by himself, cut his own hair, shave, and dress himself. (AR at 42-43.) Plaintiff testified that he believed he would be able to do laundry but that his mother always did it for him, and opined that he would be able to vacuum and sweep but had never tried. (AR at 40, 43.) Plaintiff reported that he did not make his bed, wash dishes, mop floors, take out the garbage, or pay bills. (AR at 43-44.) Plaintiff testified that he could not climb the stairs, but had no trouble feeding himself, opening doors or drawers, picking up coins from a table, or writing. (AR at 44-46, 49.) Plaintiff testified that he enjoyed playing video games. (AR at 45.)

Plaintiff reported that he could use the microwave to prepare food, but could not use a stove or oven because he was unable to stand to watch the food and might fall asleep if he sat down. (AR at 40-41.) Plaintiff testified that he could usually open a can with a can opener. (AR at 46.) Plaintiff testified that he was "always falling asleep" on a daily basis when he was taking his medication. (AR at 41.) Plaintiff reported that he saw his doctor on a monthly basis for pain management and checkups. (AR at 41-42.) Plaintiff testified that the medications helped him a "little bit" by putting him to sleep so he would not feel the pain. (AR at 47.) Plaintiff testified that he walked with a cane "most of the time" but did not bring it to his hearing. (AR at 46, 49-50.) Plaintiff stated that he had used the cane to lean on for six years, though he did not need it to walk. (AR at 49-50.) Plaintiff indicated that the cane was not prescribed by a doctor. (AR at 50.) Plaintiff reported that he did not wear any sort of brace and had never had injections in his back, wrists, or neck for pain. (AR at 46-47.)

Plaintiff testified that he had "very much, a lot of pain" during the hearing, and that it was up to an 11 on a scale of 10. (AR at 47.) The ALJ repeatedly asked plaintiff if he wanted an ambulance called, but plaintiff testified that he would be okay because he had been going through the pain for years and knew that the hospital would not be able to do anything for him. (AR at 47-49.) Plaintiff then reassessed his pain level to a 9 when his representative indicated that a 10 would mean that he would not be able to walk out of the room himself. (AR at 49.)

B. Procedural History

On April 23, 2012, applied for DIB, alleging disability since January 1, 2000, due to knee and back pain. (AR at 101-109, 134.) Plaintiff's claim was initially denied, (AR at 52, 56-63), and plaintiff requested a hearing before an ALJ. (AR at 64-65.) On March 19, 2013, plaintiff and his representative Ms. Costa appeared before ALJ Seymour Rayner. (AR at 33-51.) On May 2, 2013, the ALJ denied plaintiff's claim, finding that he was not disabled under the Act. (AR at 18-32.) The ALJ found that, although plaintiff had the severe impairments of status post bilateral knee surgeries for torn MCLs/RCLs, osteoarthritis of bilateral knees, and degenerative lumbar disks, he had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 416.967(a). (AR at 23.) Although the ALJ found that plaintiff was unable to perform any past relevant work, he found that "there [were] jobs that exist in significant numbers in the national economy that the claimant can perform." (AR at 27-28.)

On July 5, 2013, plaintiff requested review by the Appeals Council, (AR at 16-17), which was denied on November 5, 2014, making the ALJ's decision the final decision of the Commissioner. (AR at 1-6.)

Plaintiff filed this action on December 24, 2014. The Commissioner served the administrative record and filed an answer on March 20, 2015, and filed her motion for judgment on the pleadings on June 19, 2015. Plaintiff filed his cross-motion for judgment on the pleadings on July 20, 2015. Defendant filed her reply on August 24, 2015.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner]

9

must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id*.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. <u>Analysis</u>

According to plaintiff, the ALJ erred in failing to properly weigh the medical evidence and in failing to properly evaluate plaintiff's credibility. As set forth below, the Court agrees that the ALJ erred by failing to adequately explain the reasons for determining that the opinion of plaintiff's treating physician, Dr. Lieberman, should not be afforded controlling weight, and remands on this basis.

1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (AR at 23-28.)

a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the application date of April 24, 2012. (AR at 23.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that Plaintiff had the following severe impairments: status post bilateral knee surgeries for torn MCLs/RCLs, osteoarthritis of bilateral knees, and degenerative lumbar disks. (AR at 23.) The ALJ also found that, although plaintiff alleged disability due to a leaky heart valve, that impairment did "not cause more than a minimal limitation in the ability to perform basic work activity," and thus, was "nonsevere." (*Id*.) Substantial evidence

supports these findings, and plaintiff does not challenge their correctness.

### c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 23.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

### d. Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id.* § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that she is not disabled. *Id.*

In this case, the ALJ found that plaintiff had had the "residual functional capacity to perform the full range of sedentary work as defined by 20 CFR 404.1567(a)." (AR at 23.) The ALJ concluded that plaintiff could "sit approximately six hours, stand/walk approximately two hours and occasionally life/carry ten pounds in an eight-hour workday; he can occasionally push, pull, balance, stoop, kneel, crouch and climb stairs or ramps, but never climb ladders, ropes or scaffolds." (*Id.*)

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (AR at 24.) However, the ALJ concluded that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*) The ALJ then provided a detailed summary of the medical evidence and plaintiff's testimony. (AR at 24-27.) The ALJ concluded that "great weight cannot be given to the claimant's treating orthopedist, Dr. Lieberman, because it is not supported by the objective medical evidence." (AR at 27.) However, the ALJ gave "significant weight" to the opinion of Dr. Graber, finding it was "supported by the objective medical evidence and consistent with the record as a whole." (*Id.*)

Plaintiff challenges the ALJ's assessment of his residual functional capacity. For the reasons set forth *infra*, the Court finds that there were legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity. Specifically, the ALJ, in determining that "great weight cannot be given" to Dr. Lieberman's opinion, failed to evaluate the various factors that must be considered when determining how much weight to give to the treating physician's opinion. Because of this error, remand is necessary because the Court cannot determine whether substantial evidence supports the ALJ's decision. *See Noutsis v. Colvin,* No. 14-CV-5294 (JFB), 2016 WL 552585, at *7 (E.D.N.Y. Feb. 10, 2016); *Branca v. Comm'r of Soc. Sec.*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *11 (E.D.N.Y. Sept. 18, 2013).

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id*. § 404.1560(c); *see, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

In this case, the ALJ found "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (AR at 28.) The ALJ's rationale was limited to a one-sentence explanation: "[b]ased on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.28." (*Id*.) For the reasons set forth below, the Court finds that there were legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity.

2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ and Appeals Council failed to follow the treating physician rule because the ALJ determined that "great weight cannot be given to the claimant's treating orthopedist, Dr. Lieberman, because it is not supported by the objective medical evidence" and instead, gave significant weight to the consultative physician Dr. Graber's opinions. (AR at 27.) The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Lieberman, and remands the case on this basis.

a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set for in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinion concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." Id. § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the

12

data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources.") (internal citation and quotation marks omitted). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Lieberman.

The ALJ summarily stated that "great weight cannot be given to the claimant's treating orthopedist, Dr. Lieberman, because it is not supported by the objective medical evidence." (AR at 27.) The ALJ determined that "[s]ignificant weight [should be] given to the opinion of the one-time examining Administrative consultant, Dr. Graber, because it is supported by the objective medical evidence and consistent with the record as a whole." (*Id.*)

As discussed below, the reason given by the ALJ for rejecting Dr. Lieberman's opinion is insufficient. The ALJ did not explicitly consider the several factors required to decide how much weight to give the treating physician's opinion. Accordingly, the case must be remanded to the ALJ for further consideration of Dr. Lieberman's opinion in light of this Court's analysis.

The Court concludes that the ALJ did not set forth in sufficient detail the reasons for not affording "great weight" to the treating physician's opinion. The Second Circuit has repeatedly noted that an ALJ must "set forth her reasons for the weight she assigns to the treating physician's opinion." *Shaw*, 221 F.3d at 134; *see also Taylor v. Barnhart*, 117 F. App'x 139, 140-41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion" (internal citation and quotation marks omitted)); *Torres v. Comm'r of Soc. Sec.*, No. 13-CV-330 (JFB), 2014 WL 69869, at *13 (E.D.N.Y. Jan. 9, 2014) (finding error where ALJ assigned only "some weight" to opinion of treating physician); *Black v. Barnhart*, No. 01–CV–7825(FB), 2002 WL 1934052, at *4 (E.D.N.Y. Aug. 22, 2002) ("[T]he treating physician rule required the ALJ . . . to clearly articulate her reasons for assigning weights.").

In particular, the ALJ did not address certain of the *Halloran* factors required when an ALJ affords a treating source less than controlling weight, despite the Second Circuit's repeated admonitions to do so. For example, the ALJ's opinion does not address "the frequency of examination and the length, nature, and extent of the treatment relationship." *Clark*, 143 F.3d at 118. Dr. Lieberman examined and treated plaintiff since January 24, 2011, and saw plaintiff approximately every six weeks. (AR at 287.) In other words, he was "likely to be the medical professional[ ] most able to provide a detailed, longitudinal picture of . . . medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations." *Taylor*, 117 F. App'x at 140 (quoting 20 C.F.R. § 404.1527(d)(2)). Further, the ALJ also failed to explain his rejection of Dr. Lieberman's opinion in reference to Dr. Lieberman's status as an orthopedic specialist. *See, e.g.*, *Clark*, 143 F.3d at 118.

Dr. Lieberman treated plaintiff regularly, and his opinion cannot be discarded lightly. He specifically stated that clinical findings supporting his diagnosis included restricted range of motion in plaintiff's knees and lower back, crepitus, and grinding with motion, and that diagnostic findings supporting his diagnosis included an MRI of plaintiff's lumbosacral spine showing osteoarthritis and bulging discs and X-rays of the knees showing osteoarthritis. (AR at 287-88.) However, the ALJ dismissed Dr. Lieberman's opinion as not worthy of "great weight," reasoning that it was "not supported by the objective medical evidence.[3] (AR at 27.)

Instead, the ALJ credited Dr. Graber, the physician who performed a consultative exam of plaintiff at the request of the Social Security Administration. (*Id.*) Dr. Graber evaluated plaintiff on only one occasion, and it is unclear whether Dr. Graber reviewed plaintiff's medical records or diagnostic testing results. To be sure, the opinion of a non-treating physician can be overridden, but only where the evidentiary record supports that conclusion. *Netter v. Astrue*, 272 F. App'x 54, 55-56 (2d Cir. 2008). In other words, the ALJ must be able to point to aspects of the record that support Dr. Graber's contentions, beyond the contentions themselves. The ALJ discounted Dr. Lieberman's findings, but it is not clear

---

[3] The Court notes that the only specific critique made by the ALJ of any of Dr. Lieberman's findings was a statement that "the treating orthopedist assessed bulging disc of the lumbar spine although there are no diagnostic studies in the record indicating this finding." (AR at 27.) The ALJ also noted that "[t]here is no report of lumbar disc herniation or stenosis. There is no medical evidence of motor strength, reflex, or sensory deficits in the upper or lower extremities." (*Id.*) However, Dr. Lieberman's stated reasons for his diagnosis were based on alternate findings previously discussed, namely a restricted range of motion in plaintiff's knees and lower back, crepitus, and grinding with motion, an MRI of plaintiff's lumbosacral spine showing osteoarthritis and bulging discs, and X-rays of the knees showing osteoarthritis. (AR at 287-88.) Thus, the ALJ's reasons for dismissing Dr. Lieberman's opinion largely did not address the rationale behind Dr. Lieberman's findings or explain how his opinion was not supported by objective medical evidence.

which clinical findings, or why they were determined to be inferior to the findings recorded by Dr. Graber. *Branca*, 2013 WL 5274310, at *13; *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 431 (S.D.N.Y. 2010) (remanding to the Commissioner because "the ALJ never followed the analytical path mandated by regulation, which requires that he discuss the length of treating relationship, the expertise of the treating doctors, the consistency of their findings and the extent to which the record offers support for some or all of those findings").

Defendant points to other evidence in the record that might have supported the ALJ's rejection of Dr. Liberman's opinion. (*See* Def.'s Reply at 1-2.) For instance, defendant argues that a "2011 x-ray of plaintiff's lumbar spine revealed only moderate degenerative disc disease," "[r]ange of motion was full in all joints of the upper and lower extremities," "[s]ensation was intact and strength was normal in the lower extremities," and "Dr. Lieberman's own treatment notes reflected that Plaintiff walked frequently . . . and did not demonstrate any knee instability." (*Id.*) As an initial matter, the Court notes that the defendant's citations to the 2011 X-ray, and findings of full range of motion and sensation and strength in the lower extremities come from the records of Dr. Cooperman, who does not appear to be an orthopedic specialist and who recorded these findings more than a year before plaintiff sought DIB. (*See* AR at 259-62.) Further, there is no indication that the ALJ considered Dr. Cooperman's findings in making his determination. Additionally, none of these points articulated by defendant were made by the ALJ; rather, the defendant is assuming that these were the factors that the ALJ had in mind in refusing to give Dr. Lieberman's opinion controlling weight. Such assumptions are insufficient as a matter of law to bolster the ALJ's decision. *See Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) ("A reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'" (quoting *Snell*, 177 F.3d at 134)).

In sum, having carefully reviewed the record, the Court concludes that the ALJ failed to adequately explain the reasons for determining that the opinion of the treating physician, Dr. Lieberman, should not be afforded controlling weight. Given the failure to properly apply the treating physician rule, a remand is appropriate for such a determination.[4]

### IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further

---

[4] Plaintiff also contends that the ALJ failed to properly evaluate plaintiff's credibility. Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility. The Court notes that the ALJ concluded that plaintiff's testimony regarding "the intensity, persistence and limiting effects of [his] symptoms" [were] not entirely credible." (AR at 24.) The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations, quotations, and alteration omitted). However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.

proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  February 18, 2016
        Central Islip, NY

\*\*\*

Plaintiff is represented by Charles E. Binder of the Law Offices of Harry J. Binder and Charles E. Binder, P.C., 60 East 42nd Street, Suite 520, New York, NY 10165. The Commissioner is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by Robert W. Schumacher, II, 610 Federal Plaza, Central Islip, NY 11722.